Thank you, Your Honor. Good morning, gentlemen. My name is Kenneth Covell. I'm from Fairbanks and represent Mr. Zuber. The Fair Labor Standards Act was designed to extend the frontiers of social progress by ensuring to all our able-bodied working men and women that fairs day pay for fair day's work. Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people. To wage in our case, Mr. Zuber is presumed to be non-exempt and entitled to overtime. Flowerly language from 1934, still the law of the land. Clearly. That may be true, but you're here on cross-motions for summary judgment. Is there a disputed issue of fact that would require the reversal of district judge grant of summary judgment? In other words, if there's no disputed issue of facts, we go one direction. If there's a disputed issue of fact, we go the other. Now, you're claiming there's a disputed issue of fact regarding the facts that were used to determine whether your client is entitled to exemption. The facts as they are in the record I don't really think are disputed. It's what the facts mean. Exactly. So now we're at interpretation issue of law. Yes. Okay. And so we can affirm or we can reverse and give you summary judgment. Right. Those are our two options. I would agree. I think the court has the option of remanding for further consideration. I pondered that quite a bit, and I'm not going to stand here and tell you you can't do that. I don't think that would be in the interest of judicial economy. I don't think it's necessary, and I think it ought to be decided one way or the other. Okay. In your view, what are the facts that are undisputed? I mean, the other side is perfectly free to stand up and say, wait a minute, there are a lot of disputed facts. But tell us the facts that, in your view, make your client eligible for overtime. Well, again, you start with presumption. Mr. Zuber essentially was a safety inspector. The facts are laid out that for probably 80 percent of his time, he did what was called permitting, and he did safety auditing. Now, permitting, I gather from your brief, is a term of art. He does not himself actually issue the permits. He fills out certain parts of the permits, and somebody else is the actual issuer of the permit. Is that correct? Yes. That may or may not be a dispute from the other side. Okay. There's testimony in the record to that effect. I know there is. So those are the things that he does in large part. The question is, does that mean he's exempt or non-exempt? And we submit that it's plain and clear that he is non-exempt. He's entitled to overtime. Based upon what facts and your interpretation of those facts? Based upon the facts that, for instance, Mr. Zuber says he didn't have discretion in independent judgment. Mr. Zuber says, if there was a problem, I went down, I pulled out the ASHA safety handbook, I looked up the regulation, and I applied the rule to the situation I was dealing with. Well, he does that, but he also in his log describes various things, and I want to stay away from magic words. I just want to describe it factually as best I can without implicating yet legal conclusions. There's a fair amount of resourcefulness in his job. He talks to these people. He tries to figure out what safety problems are, how to solve them. It's not, you know, this is six feet away, and it must be ten feet away. It's not quite that cut and dried. There's real application of genuine skill and resourcefulness by Mr. Zuber. Is that a fair characterization of what he does? But skill doesn't make him exempt. I understand that. Skill and resourcefulness. And discretion is a hard word sometimes to define, so I'm staying away from that. But skill and resourcefulness. Let me ask you this. I've got in your brief the regulation describing inspectors, such as safety specialists, do not meet the duties requirement for the administrative exemption. When was that regulation put into effect, and is there any dispute as to whether or not that regulation applies to the facts of this case? We cited to the new regulations that got put out, and I've talked about fire safety inspectors. Those were put into effect after the case took place here, but I'm not sure where you're at, Your Honor. Well, it's not in your brief, page 27. All right. And it says done new regulation, and it gives the federal regulation citation. I confess I did not go back and look up the history. I don't know when it came into effect. That's the regulations that came out in the last year since the court ruled in this matter. So that's not. Do those regulations purport to be a change of law or merely an implementation of what the law has been all along? I'm glad you asked that, and I think we answered that in our brief at the top of page 17, where it says the DLL explained its purpose in revising the regulations as protective, and basically they say these are nation's most important worker protections, and they're effectively updating them because we've had sort of a shift in our workforce. Necessary to restore the overtime protections intended by the statute, which have eroded over the decades. Now, what am I supposed to understand by that? Now that we've got the new regulation, does it regulate behavior during the period during which there was, quote, erosion? No, Your Honor. They're not retroactive, I don't believe, and I'm not making that argument. I'm putting that in there as persuasive authority to say that the department revisited from 1934 until 2005 changes in the workplace, and yet and still they effectively say we've said inspectors are non-exempt. We said that in 1934, and we're making it clear here today in 2004-2005 that fire safety inspectors are non-exempt as well, and we're analogizing Zuber's duties to be very similar to fire safety inspectors. So it's possible under your view to construe these regulations simply telling us what the statute has meant all along? Yes. So you start out with the exemption. We suggest that the interpretive subpart B part of the regulations say and said all along that inspectors are non-exempt. You know what I mean? That seems to be pretty clear authority here in Mr. Zuber's favor. But then you move on from there. Well, maybe I would ask you this. On page 18 of your brief, you relate that argument about the subsection shows an example of inspectors, fire inspector safety as not being exempt. What are the facts then that we should look at to make sure that we get your interpretation out of the facts in this case? In other words, does he fit the standard, whatever an inspector is? How do we look at those facts? One that would be exempt or non-exempt? Well, I think... Is it the fact that he just said inspector is enough? Not necessarily. And I think one of the things I view as a big distinction, and this comes back to the regulations too, but the regulations say an inspector is non-exempt. The regulations say a safety director is exempt. You go to the case like Copas v. East Bay Municipality District, Mr. Copas was a safety director, and Mr. Copas exercised discretion in independent judgment. He could approve workers' compensation settlements to one degree or another. And there are three or four or five duties like that that Mr. Copas had that Mr. Zuber didn't have. According to this example, it's a management or general business operations function that puts him up into the exemption. And you're saying your client does not meet that. Correct. Because one of the ways it's put is to say, did he do the work of the business versus did he affect or change the way the business ran? Was his business running the business? And, you know, my suggestion is that a man that goes out and does a sniff test in a tank, a man that goes out to a work bed to inspect whether scaffolding is being complied with a particular job hazard analysis or something, is not saying, we're going to have a new policy in the field to do this or to do that. And that's the distinction. It's whether or not Zuber ran the business or he did the business of the business. Now, he had a supervisor who was a safety supervisor. Is that correct? Correct. And was that safety supervisor on site or elsewhere? I think elsewhere. Zuber worked for him for about seven years. The period of time of our suit is about a year and a half, two and a half years. I believe, and I might be mistaken, that at the time he was at Kaparik, which was his last job site, there was a safety supervisor on site. So his superior. Yes. And who did the actual decision to issue the permits? Because as your view of the evidence is, he filled in certain forms, certain portions of the form, but he was not himself the issuer of the permit. Who was the issuer of the permit? It was, I believe, the foreman of the job. And, again, Zuber testified about that, but there were four or six places to sign on the form, and I wish there was one in the record. I don't think there is. And there was a place for Zuber to sign. There was a place for four or six individuals to sign. But Zuber didn't order the work. The foreman would say, we need to weld on this tank. You have to get the noxious vapors out of there, and you have to go through this permitting process to get there. So it was the foreman that was in charge. Superintendent, probably, was the term, I think. Okay, but in any event, somebody with authority to grant the permit who is not Zuber. Right. That's your view of the evidence. Right. I mean, Zuber was involved, but he wasn't the authority there. Now, what do you make of the argument that he had the right to stop work at any time he thought the work was unsafe? Any employee on the job for APC could stop any job if they thought it was unsafe. So that doesn't give him any more authority than the tire buster on the job. Well, it doesn't, of course, because it's common in many industrial work sites to say that anybody can stop work if he or she thinks it's unsafe. And most companies, when they say that, mean it. But the truth is the operational responsibility for stopping jobs when they're unsafe mostly devolves on the safety inspector. I don't know if I fully agree or disagree. Zuber's not on the job. He's on different job sites all the time. You've got a foreman on the job site. I mean, hopefully, the foreman knows what's safe and what's unsafe, and if something's unsafe, he'll stop the job. Yeah. Now, do we have anything in the record that tells us whether or how often he has stopped work because he thinks it's unsafe? He testified that he never stopped a job, to my recollection. Or if he did, maybe once. But I believe he testified that he never did. Do you want to check and see if they disagree on that factual argumentation? Sure. Okay. I submit the regulations say safety inspector, which Zuber is, is non-exempt. Safety director is exempt. There's a clear dichotomy there. You know, is it possible you could have a safety inspector who exercised the various management type skills or issues? Yes. But when you look at this case, and, again, you start with the presumption he's entitled to overtime, and you look at the hierarchy there, Zuber's the field-level guy. What are we supposed to do with our case, O'Dell? I think O'Dell is controlling authority to say that you should rule in our favor. Good. How does that work? Because … The list for me is the other way around. I list it like a troublesome case for you. Okay. Well, I'm glad we're here because if that's what the issue is, we need to talk about that. O'Dell and that New York case I put in the footnote, Debbie Jean or DeBejian, I thought were the two cases that had the highest factual similarity to Zuber's work. And O'Dell was, I believe, a quality control inspector, which is a slightly different job than safety specialist. He, for instance, I believe, would test the concrete to make sure it met the particular standard. But the thing O'Dell could do that Zuber couldn't do is O'Dell could approve non-conforming work. So even if you take the O'Dell decision as good authority, I suggest it's still favorable to Zuber because he had that opportunity to exercise independent judgment. And some of the cases they cited out of Texas, there's the one with the weld inspectors. The weld inspectors could accept non-conforming welds. There's no evidence in the record to show that Zuber could approve things that didn't conform to the regulations. And I suggest that analysis is critical here, and even contemplating the issue of whether you ever get over the presumption he's entitled to overtime. But I further suggest that O'Dell has been backhandedly overruled by Auer and the Supreme Court case and Botham. You know, because it's the, as I recollect, that the regulations were not followed by the court, the DOL regulations. And after Auer came out, it said you have to follow them. And therefore, the decision in O'Dell today would be that O'Dell is non-exempt and entitled to overtime. We've got a problem, I think, if in order to get to your position, we need to say that O'Dell was wrong. Because under our own rules and customs, to say that O'Dell was wrong and we're just going to disregard it, in the absence of some intervening authority like change of statute or Supreme Court case, we have to go and bomb it. Well, the intervening authority is the Supreme Court case. Okay. I mean, I don't think you can, to go to the converse, I don't think you can say, well, we're just going to read O'Dell the way it is and follow it. You know, I think you've got to deal with that one way or the other. Okay. And that's my suggestion how. But it's also my suggestion, even if you did that, it's still a good case for Zuber because O'Dell had discretion. Distinguishable on the facts. Yeah. Okay. Exactly. Okay. You know, you've got about three minutes. Let's hear from the other side. Certainly. Let's get your argument in the hand, and then you'll have three minutes to respond. Thank you, Eric. Good morning. My name is Greg Youngman. I'm appearing on behalf of APC Notchik, and with me at my side is Mark Nelson, who is the operations manager for APC. Mr. Zuber, as a safety specialist, worked in a critical position for APC. Mr. Zuber's job responsibility was to ensure the safety of approximately 600 to 700 of his coworkers at APC, as well as APC's property. To put things in perspective, I think it would be helpful to the court to understand what it is that APC does and the environment in which Mr. Zuber worked. APC is an oil field services contractor. In essence, what it does is it provides construction services, inspection services, maintenance and repair services for the major oil companies on the North Slope of Alaska and along the Trans-Alaska Pipeline. APC is headquartered in Anchorage, Alaska, and is a subsidiary of the Yard of Slope Regional Corporation, one of the original 13 native regional corporations. At the time Mr. Zuber worked on the North Slope, there were approximately 600 to 700 coworkers working just at the Kaparik field. I think it's really helpful to understand what the North Slope of Alaska is. The North Slope of Alaska is North America's largest oil field. I know that. We know that. It's irrelevant. Whether it's the largest or the smallest, we're doing oil field work. We've got 600 employees. But what's critical to keep in mind here is that the North Slope of Alaska is a very unique environment. It's a harsh environment, a very dangerous environment, and the safety and efficiency of operations is critical. On the North Slope, to the North Slope operations and its facilities, as well as the Trans-Alaska Pipeline. Mr. Zuber was hired as one of a very few individuals for APC, compensated on a very highly basis to ensure the safety of APC's workers. Mr. Zuber was paid on a day rate and worked a two and two shift. What that means is that he would work on the slope for two weeks and then he would be off shift for two weeks and transported back to his home for rest and relaxation. Is it in the record what the shift practices are for the salaried workers for whom there's no question but what they're covered under the federal statute? Do they also work two and two in the same way? On the North Slope, typically the shifts are either one and one or two and two, sometimes three and three, and it just depends on what the operation is. So a lot of the workers entitled to overtime are working the same sort of schedule as Mr. Zuber? That's my question. That's correct. Are there any other employees that work the same way as Mr. Zuber? In other words, if he's on two and two, when he's gone there's obviously safety going on so there's somebody else doing something. Yes, he has what are called alternates that perform the same functions as he did. And at the time that he was a safety specialist, I believe there were a total of three safety specialists. So there's three folks that are working in this particular classification. Correct. Okay. And that's why he's keeping these quite marvelously detailed logs so we know pretty much exactly what he's been doing. Exactly. Because he's preparing these for the other guys when they come on. Exactly. And, in fact, what they do is they do a turnover with their alternates so that they know exactly what's going on from one period to the next. Did the executive employee to whom he was directly assisting work the same shift, on the same shift basis? Because the trial judge seemed to make a point that he was regularly and directly assisted an executive employee of APC. I don't know that there's anything on the record. I believe the record indicates that there was a safety supervisor who essentially oversaw the safety program for APC on the slope. Was the relationship with the alternates the same as Mr. Zuber's relationship with the supervisor that he assisted? Yes. Were they on the same shifts on the same – or did these three alternates all report to the same supervisor? I believe they reported – Or a similarly situated, similar supervisor, if they were dividing up the shifts? Yes. Essentially the same chain of command. The trial judge went down through the list of so-called standards for factors and specifications and pretty much concluded that Mr. Zuber fit each one of these. But the trial judge didn't recite any facts that support those conclusions. He just said he was – he just enumerated the facts and said he fits all of them. He does enumerate the facts, but I would also point out that he did reference by footnote a significant portion of APC's motion for summary judgment. And certainly the judge could have gone back and recited all of the facts and all of the evidence in the record in his written opinion. Well, if we were looking at a Rule 52 of these facts, do they pass the test? They're not clearly erroneous. Are we supposed to go back and do all that footnote excavation to see what the trial judge was considering? Or is he supposed to say himself what he's considering? Well, what he does is he references, I believe, pages 8 through page 32 of APC's motion for summary judgment and essentially accepts the record evidence that APC presented in the summary judgment proceeding. And that included – and this is what makes this case remarkable. The evidence upon which APC's motion rests is the evidence that Mr. Zuber produced. It includes his discovery responses. It includes his deposition testimony. It includes his daily logs. And it includes his own affidavits. That's what APC rested its entire – premised its case on. Now, I'm sorry. Let me go. I'm inferring from what you just said, but I want to make sure I understand it clearly, that you may agree then with the other side that this, in fact, is a suitable case for summary judgment either way. That's to say there is no serious dispute about the facts. The only question is what do they mean. Or do you have factual disputes? No. We would submit that there are no factual disputes. It's been admitted to in briefing on both sides. And then you would go one step further then. If I'm correct, I'm looking at the judge's decision, he reveals six sets of facts – seven, excuse me – footnoting into clerk's docket 62-18-32, which is those. So if we review 18-32, and if we agree with those seven factual determinations, and if 18-32 support them, it's game over. If they don't then, we might have a chance of reversal. That's our record. I agree. Okay. What's your view as to the meaning and applicability of the new regulation that says that a safety inspector is an hourly employee? We disagree that that new regulation applies to this case for a couple of reasons. First of all, the regulation is not retroactive. It is a new regulation. Secondly, the regulation relates to public sector inspectors. This is not a public sector inspector situation. And why is that different? Well, as – and I'll paraphrase the new regulation. It says it relates to public sector inspectors who generally do not meet the duties requirements for the administrative exemption because their work typically does not involve work directly related to the management or general business operations of the employer. Their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures. And that's clearly distinguishable from the situation that we have here. I'm having a little bit of trouble following why a public sector safety inspector is different from a private sector safety inspector. Now, obviously, any company is free to apply any name or label to any employee. You can call the CEO a safety inspector or you can call the guy who sleeps up a safety inspector. But there is a sort of a common meaning here. And I don't see necessarily that someone who's a safety inspector in a public sector job has a different job than what's here. Every description I see here in the regulation is, you know, it doesn't fit too badly with what Mr. Zuber did. Well, and I don't know what public safety inspectors do, and it may be that they have checklists or if they're involved in inspecting buildings, there are specific building guidelines or building inspection guidelines that are required to be followed. And it's more of a – it doesn't involve the use of discretion or independent judgment. It's more of an application of gathering facts to known standards. But as you said, you don't know what they do. You're just kind of guessing that this may be what they do. I see. Let me go back to the first point, which may be more important. Why do you say it's not applicable? The argument that it would be applicable is, and I'll state it in its strongest form. I'm not sure where I come out on it, but it is that this regulation is merely declaratory of existing law. They're just trying to construe the statute for us. And it's not retroactive. It's just what statute means. It's not the wording of the statute. It's never been changed. How would you respond to that way of reading the regulation? Well, I don't think the law has changed. I think this is intended to be an interpretation of the law, and the regulations do provide examples of the types of things that may or may not be exempt. I think the important thing to keep in mind is that each position has to be individually evaluated. Yes. Now, I'm not sure I've fully understood the answer, and I don't want to pin you down in an unfair way, but when you said, I don't think the law has been changed, and this is just interpreting the statute, that sounds as though to the extent that this regulation might be applicable to Mr. Zupich's situation, and your point, too, says it's not, but to the extent that it's applicable, well, that just tells us what the statute means, and applying the regulation is not retroactive. It's simply telling us what the statute means. Now, did I misunderstand your position? If I did, please tell me. I mean, I'm not trying to put you into a corner. Well, and I'm not sure, and I don't want to be cagey, but I'm not sure what the position is because this issue wasn't researched. I mean, I think there's a – Did this regulation come out after the trial judge made his decision? Yes, it did. Yeah. And so it wasn't part of the record, and I don't think for that reason alone, I don't think it's relevant in this appeal. Well, if the regulation reflected the law to the date of the regulation, if so, then the regulation in the state, it just probably restates that. We're sitting on a federal common law here because we're taking every case on its own facts and creating a new benchmark. This case will make a benchmark on its own facts, and so if we look back at the old law before or after this regulation of other states or whatever, we're going to find out what people in these general categories do. So if we look at inspectors, some inspectors do this, some inspectors don't do that. Isn't the way we sort this out? Because they're all factual, like you said, determinative. All facts are different, but we have to interpret what those facts mean. I agree. The regulation didn't say much other than the fact that fire inspectors – It just provides an example. Yeah, that's exactly. It's an example. Okay. I wanted to briefly address the issue of the work permits, and in essence, Mr. Zuber did play a very important part in the issuance of permits. In essence, the job couldn't go forward unless Mr. Zuber said go, and permits were reviewed by several people. This wasn't a situation where you go down to the city clerk and you ask for a permit to go open up a hot dog stand on the corner of 4th Avenue and D Street. These were significant projects that involved danger or could involve serious accidents and harm to property. Mr. Zuber testified about the process that went into issuing these permits, that he would do a pre-job inspection to determine what potential hazards there would be. He would take a look at who was doing the job to determine whether or not they were properly qualified and certified to do the job. So it wasn't just a mere application of putting a stamp on it saying go out and work. It involved the use of judgment and experience and skill in determining whether or not that job should go forward. And so it was a very, very important function. And as I understand it, his sign-off is necessary, but it's not sufficient. Meaning if he doesn't sign off, it doesn't go forward. If he does sign off, it may or may not go forward. That is to say, somebody up above then says and will go forward. Is my understanding of the facts correct? That's my understanding. The other thing to point out is that was only one of many primary duties that he was engaged in. Job hazard identification, writing policies and procedures. When you say writing policies and procedures, what do you mean? He testified that on occasion where he would observe a safety hazard where there was no policy or procedure or safety standard, he would be asked to write a safety procedure or a job hazard analysis so that those hazards could be addressed on future projects. What's attracting my attention is the word policy. Give me an example of one that you characterize as a policy or procedure that he writes. It really could be anything depending on the nature of the job. And I don't recall... Whether they have railings on the roof, for example, I know that was one of the issues at one point. Would that fall in that category that you described? Yeah, if there was no prescribed procedure, then he could recommend a procedure and write a policy. Whether to use a table saw, that's what you're encompassing when you say that. Exactly. So this was just one part of many that he described as primary duties. Now, what's your view of the evidence in terms of whether he ever stopped a job because of a safety concern? Did he ever? I understand he had the power to do so. Did he ever? I don't recall there being anything on the record one way or the other as to whether he could stop the job. So there's nothing in the records that shows that he did? I don't believe there is. You have the record that he had the power to do so, but there's nothing in the record that showed that he actually did? I don't believe so. Okay. Thank you. One thing that I wanted to clarify on the record is Mr. Since there's two main themes that are raised in Mr. Zuber's briefing relating to the exemption criteria. The first is that Mr. Zuber's work did not relate to management policies and or that it was not important to APC's business. That position, we believe, is not believable. The regulations say that it's not limited to persons who participate in drafting policies or making procedure. Also, it may include those who affect policy or those who have a responsibility to carry out those policies. And APC's position is that that's exactly what Mr. Zuber did is he was responsible for carrying out APC's safety policies. And so that's just a misunderstanding or misapplication of that part of the regulation. Was his work substantially important? I think that's a no-brainer. Mr. Zuber himself testified that the most important part of APC's business was safety and that it was his job to ensure the safety of the workers and the facilities. The federal regulations also recognize the importance of advisory specialists and safety directors in 29 CFR 541.205C5. So I don't think that there is a serious contention that what Mr. Zuber did was not important to APC's business. But what he tries to do to get around that is he argues that he did production work. Mr. Zuber did not do production work. To bolster his argument, Mr. Zuber had the gumption to represent that APC was in the safety business and that safety inspection services or products is what APC sold. That's just a distortion of the record. APC did not sell safety services as part of its marketplace offering. And so I think that argument falls flat on its face. The other issue is exercise of discretion in independent judgment. And the record is chock-full of citations to his daily logs, his deposition testimony, and his discovery responses that chronicle on a daily basis the types of things that he did. It's very useful. I think we know all in extraordinary detail what he did. The question is the characterization. Okay, thank you. Thank you. You've saved, I think, about three minutes. That's very good. Thank you. Let me go to Mr. Youngman's last point there. He says, well, what Zuber did was important to management. And my mind goes to regulations where they talk about the boy with the bank bag who goes to the bank and loses it. Right? That's obviously very important to management. But what the commentary says, it's not important to management in a way that makes them exempt. Okay? So the same thing if you've got a floor sweep and he says, I'm going to use the coarse broom instead of the fine broom today, we don't say, let's call Mr. Nelson, the CEO in Anchorage, and tell him we're going to use the coarse broom or the fine broom. If Zuber says, gee, guys, and there is some leeway for a non-exempt employee to use some discretion. You've got to decide to use the blue marker or the red marker. So if Zuber says, use the table saw instead of the worm drive saw, that's a better idea. And they go, okay, Zuber, that's fine. Again, if somebody is going to call Mr. Nelson in Anchorage, the CEO, and bother him with that detail, it's important to them that the shop floor is clean and they use the right broom and that the inspections are made and the business gets done. But it's not important for the effect of running the business, for the formulation of how the business is run. And I think the biggest response to that is, if he's right on that, then how come it says in the new regulation fire safety inspectors are not exempt? So it's important work, but it's not important to the running of the business. And that regulation, and the old regulation, also says inspectors are not exempt. So I think that covers that point very well. I'm sort of surprised to hear Mr. Youngman say Zuber is full of baloney by saying we provide safety inspection services. I may be mistaken, but I thought when he got up here and started his talk, he said among the services we provide are inspection services. So it seems that he's internally inconsistent there. But I suggest the product they sell. Judge Goodwin's question about the executive employee who Zuber assisted, I still don't know who that is to this day. I've never got a name as to who that individual is. So I don't know how we can say he did that. In regard to the permitting process, the permitting process is quintessential, I guess, example of applying skill and knowledge. When you go, they're tank trucks. They get filled with oil, it corrodes them, they need to be welded. You can't go in there and weld because you're going to get poisoned or blow it up. So you've got to vent them out, and then you can go in and weld with certain safety precautions. Zuber had to put a sniffer in, a chemical smeller, and if it was above or below a certain level, either you could go in or not go in. Zuber had to see if there was a fire extinguisher on site. Zuber had to see if the electrical cords were all unplugged so he could get a spark. Thank you, Judge. Thank you very much. Thanks both sides for a helpful argument in this case. Zuber v. APC Natchik is now submitted for decision. We'll take a ten-minute break, and upon our return, State Street Bank will be the first case on the argument calendar.
judges: Goodwin, Brunetti, W. Fletcher